UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-60098-civ-Zloch

CLAUDIO ALFONSO PALLARES, et al.,

    Plaintiffs,
v.

CWC TRANSPORTATION, LLC, et al.,

    Defendants.
_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through the undersigned counsel, pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, hereby file this response in opposition to Defendants' Motion for Summary Judgment [DE 54] ("Motion"), and in support state the following:

**I.   Summary Judgment Standard**

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Maniccia v. Brown,* 171 F.3d 1364, 1367 (11th Cir.1999). The movant bears the initial responsibility of informing the court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In response to a properly supported motion for summary judgment, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).

If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

1

S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The court, however, must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Maniccia v. Brown*, 171 F.3d 1364, 1367 (11th Cir. 1999).

A court is not to resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, the appropriate inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## II.     The Motor Carrier Exemption

Defendants argue that Plaintiffs are exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 201 *et seq.*, under the Motor Carrier Exemption, 29 U.S.C. § 213(b)(1) ("MCE").

"Exemptions from the overtime provisions of section 207 are to be narrowly construed against the employer. The Act should be interpreted liberally in the employee's favor. The defendant must prove applicability of an exemption by 'clear and affirmative evidence.'" *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992) (internal citations omitted).

"There are two requirements for an employee to be subject to the motor carrier exemption." *Walters v. American Coach Lines, Inc.*, 575 F.3d 1221, 1227 (11th Cir.2009). "First, his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA." *Id.* "Second, the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property ***in interstate or foreign commerce*** within the meaning of the Motor Carrier Act." *Id.* (citations omitted) (emphasis added); *accord* 29 C.F.R. § 782.2(a).

Plaintiffs do not dispute that their work for Defendants affected the safety of operation of motor vehicles, but disagree that their work was in interstate commerce.

## III.    Interstate Commerce

Defendants' Motion does not begin its argument regarding the interstate commerce requirement of the MCE until the last paragraph of page 9.

2

A.  Plaintiffs' Pleadings

Defendants first argue that Plaintiffs engaging in interstate commerce is "clearly, unambiguously, and repeatedly acknowledged" in Plaintiffs' pleadings—Plaintiffs' Complaint [DE 1, ¶ 3], Plaintiffs' Amended Complaint [DE 30, ¶ 3], and Plaintiffs' Second Amended Complaint [DE 45, ¶ 3] ("Pleadings").[1]

Plaintiffs' Pleadings at ¶ 3 allege:

> At all times material hereto, Defendant, CWC TRANSPORTATION, LLC, was a Florida corporation with its principal place of business in Broward County, Florida, engaged in commerce in the field of transportation of petroleum products, at all times material hereto was the "employer" of Plaintiffs as that term is defined under statutes referenced herein, **engaged along with its employees in interstate commerce**, and has annual gross sales and/or business volume of $500,000 or more.

Emphasis added.

These allegations establish that FLSA's Enterprise Coverage applies to the corporate defendant. These allegations do not establish that Plaintiffs were personally engaged in interstate commerce. To establish Enterprise Coverage, two or more employees must be engaged in interstate commerce. Plaintiffs' Pleadings at ¶ 3 allege that Defendants "engaged along with its employees in interstate commerce." "Employees" is plural to indicate that two or more of Defendants' employees engaged in interstate commerce. Plaintiffs' Pleadings at ¶ 3 do not allege that **all** of Defendants' employees engaged in interstate commerce. Plaintiffs' Pleadings do not allege that Plaintiffs engaged in interstate commerce.

Defendants made similar arguments in their Motion to Dismiss [DE 8 and 9] in *Avila v. CWC Transportation, LLC et al*, Case No. 17-cv-60041. Paragraph 3 of the *Avila* complaint is identical to Plaintiffs' Pleadings at ¶ 3. The Honorable Judge Ursula Ungaro denied Defendants' motions in the Court's Order [DE 13]:

> Defendants ask the Court to rely on: (1) Defendants' unsupported representations concerning Plaintiff's role as their employee; (2) Defendant's unsupport [sic] representations concerning Defendants' business; and (3) extrinsic evidence concerning CWC's DOT

---
[1] Defendants' Motion at pp. 9-11.

3

> registration. D.E. 10. However, **none of these pieces of argument or evidence are either alleged or can be inferred <u>from the allegations in Plaintiff's Complaint. D.E. 1</u>**; D.E. 10. Because the Court is limited to the four corners of Plaintiff's Complaint in ruling on a motion to dismiss under Rule 12(b)(6) and, **based on Plaintiff's allegations, cannot find that Defendants satisfy either prong of the motor carrier exemption, Defendants' Motions are denied.** *Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *Burton v. Hillsborough Cty., Fla.*, 181 F. App'x 829, 840 (11th Cir. 2006) (plaintiff not required to negate application of FLSA exemption, which is an affirmative defense, in her complaint); see *Ceant v. Aventura Limousine & Transp. Serv., Inc.*, 874 F. Supp. 2d 1373, 1383 (S.D. Fla. 2012) ("A plaintiff is not required to negate the possibility of independent contractor status in order to avoid dismissal."); see also *Roberts v. Caballero & Castellanos, PL*, No. 09-23131-CIV, 2010 WL 114001, at *3 (S.D. Fla. Jan. 11, 2010) (same).

Emphasis added.

Accordingly, Plaintiffs' Pleadings do not establish that the MCE applies to Plaintiffs.

B.      <u>Intrastate Movement</u>

After some discussion regarding Plaintiffs' duties affecting the safety of operation of motor vehicles,[2] which Plaintiffs do not dispute, Defendants resume their interstate commerce argument by noting that purely intrastate movement may constitute part of interstate commerce.[3]

In nearly all the MCE cases in which courts have held that the exemption applies to purely intrastate movement, the defendant is either the shipper, a subsidiary of the shipper, or a carrier hired by the shipper to transport its goods. Additionally, the products being moved are not modified or altered in transit except for repackaging or reconfiguring in some cases.

In *Mena v. McArthur Dairy, LLC*, 352 Fed. Appx. 303 (11th Cir. 2009), the defendant was a subsidiary of a national company that retained control of the product from production out-of-state through transit into Florida and to final delivery. The plaintiff was employed by a Florida-based subsidiary of Dean Foods Company ("Dean Foods"), a national company that produces and

---

[2] Defendants' Motion at pp. 11-12.
[3] Defendants' Motion at p. 12.

4

distributes dairy products. Dean Foods manufactured its products in other states and delivered them to its subsidiary's warehouse in Florida. The products arrived in Florida "pre-packaged and ready for delivery."[4] The products were "not modified once they reached [the subsidiary's] warehouse."[5] The products were then transported by the plaintiff from the Florida warehouse to local grocery stores and Sky Chefs, a catering company, which supplied food and beverages for airline flights that were bound for destinations outside Florida.[6] Immediately after noting that the plaintiff transported products to airline flights bound for out-of-state destinations, the Eleventh Circuit held that the movement of the products was part of a "practical continuity of movement" across state lines.[7]

Unlike in *Mena*, "CWC is independently owned and not a subsidiary of any refining company."[8] The fuel delivered to Port Everglades *does not* arrive "pre-packaged ready for delivery" and the fuel *is* modified after it reaches Port Everglades. None of the gasoline transported by Plaintiffs is bound for out-of-state destinations.[9] All gasoline delivered to Port Everglades is base gasoline[10] and, by federal law, cannot be sold to the general public or retail gas stations in the form that it arrives.[11] Fuel detergents, ethanol, and other additives must first be added to the gasoline at Port Everglades at the time that the gasoline is loaded into the tanker trucks operated by Plaintiffs.[12]

At the time the base gasoline is delivered to Port Everglades, neither the product nor the customer is defined.[13] CWC fills orders for fuel marketers on a daily as-needed basis at Port

---

[4] *Mena* at 304.
[5] *Id.* at 307.
[6] *Id.*
[7] *Id.*
[8] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 61.
[9] Joint Stipulation of Fact [DE 52] at ¶ 2.
[10] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 14.
[11] 42 U.S.C.A. § 7545(l). Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 25.
[12] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 23, 27, 29, 39, 40, 41, 44, 45.
[13] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 56.

Everglades.[14] Only after a branded or unbranded gasoline is ordered by a fuel marketer is the gasoline then produced at Port Everglades before being loaded into a CWC truck.[15]

CWC is contracted by different fuel marketers to transport branded and unbranded gasoline from terminals at Port Everglades to different retail gas stations.[16] The shippers are the various refining companies delivering base gasoline to Port Everglades.[17] Defendants do not work for the shippers.[18] Defendants are not owned by the shippers.[19] Defendants do not make deliveries on behalf of the shippers.[20] Nor is there any evidence that any retail gas stations, fuel marketers, or Defendants take ownership of any branded or unbranded gasoline until after the base gasoline comes to rest at the storage terminals. On a daily as-needed basis, branded and unbranded gasolines are (1) ordered by the fuel marketers, (2) base gasoline, ethanol, fuel detergents, and other additives are then mixed at the terminal, and (3) the newly produced branded and unbranded gasolines are then loaded into the tanker trucks.

There is no evidence that the shippers have any knowledge, control, or concern as to where the goods will ultimately be delivered by Plaintiffs. Thus, Defendants cannot establish the requisite fixed and persisting transportation intent on the part of the shippers necessary to meet Defendants' burden of proving that the goods carried by Plaintiffs in this case are done in interstate commerce for purposes of the MCE.

Because the goods that were transported locally by Plaintiffs and were not bound for interstate destinations, crucial to this Court's determination of the essential character of Plaintiffs' movement of the goods is the ***shipper's*** fixed and persisting intent at the time the goods are shipped. *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670 (10th Cir. 1993).

In nearly all of the MCE cases involving intrastate movement in which courts have held that the MCE applies, the defendant is either the shipper, a subsidiary of the shipper, or a

---

[14] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 60.
[15] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 39-45, 60.
[16] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 52-58, 60-62.
[17] *Romero* at *4. Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 59.
[18] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 57-58.
[19] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 61.
[20] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 57-58, 60-61.

carrier hired by the shipper to transport its goods. For example, in the case of *Swift Textiles, Inc. v. Walter Motor Lines, Inc.*, 799 F.2d 697, 698 (11th Cir. 1986),[21] the intrastate motor carrier was a transportation company ***hired by the shipper*** to transport goods from the shipper's temporary storage facility to their "intended destination inland." *Id.* at 698. Based on these facts, the court held that a "temporary stoppage within the state" did not change the character of the goods' interstate movement where the ***shipper's*** intention existed at the time the movement began was that the goods come to rest at ***its*** inland stores. *Id*. at 699-700.

Alternatively, the defendant in these cases (whether shipper or not) at the very least controls the movement of the goods from the moment they leave their out-of-state location to the moment they reach their intended intrastate destination. For example, in the case of *Galbreath v. Gulf Oil Corp.*, the defendant was both the shipper of petroleum goods and the owner of a local bulk distribution plant at which plaintiffs were employed as drivers making wholly intrastate deliveries. 413 F.2d 941, 942-944 (5th Cir. 1969). Crucial to the court's holding that these drivers were engaged in interstate commerce for purposes of the Motor Carrier Act was the fact that the defendant shipper "retained control over the products from the time they left the refinery until they were delivered to the consumer." *Id.* at 947; s*ee also Atlantic Independent Union v. Sunoco, Inc.*, No. 03-4389, 2004 WL 1368808 (E.D. Pa. June 16, 2004) (holding that drivers who delivered fuel products from the defendant's main terminal facility in New York to customers in that state were exempt under the Motor Carrier Act where the defendant, a subsidiary of the shipper, took ownership of the products at the pipeline facilities and maintained ownership as they moved continuously through the pipelines and into the defendant's temporary storage facilities).

In contrast, Defendants in this case are hired and paid by the petroleum marketers, who are the ***customers*** of the shipper. Defendants do not work for the shipper. They are not owned by the shipper. They do not make deliveries for or on behalf of the shipper. The shipper does not make or arrange for deliveries. The shippers deliver the base gasoline to its storage terminals at Port

---

[21] It should be noted that the interstate commerce analysis in the Swift case, while proffered in the context of the Carmack Amendment to the Interstate Commerce Act (which deals with liability for goods damaged by motor carriers in interstate commerce), is nonetheless helpful in defining interstate commerce for purposes of the Motor Carrier Act.

7

Everglades where the base gasoline comes to rest. The shippers do not have any fixed and persistent intent to transport the base gasoline beyond the Port Everglades fuel terminal *at the time the base gasoline is shipped from out of state*.

Fuel marketers purchase various branded and unbranded gasolines on a daily as-needed basis. The shipper does not ship fuel to the Port Everglades terminals from out of state to fill specific orders. The fuel marketers do not take ownership of the branded and unbranded gasolines until after they are produced at Port Everglades and loaded into Defendants' tanker trucks. There is no evidence that the shippers have any "fixed and persisting transportation intent beyond [their] terminal storage point[s]," which in this case are the large storage tanks at Port Everglades. *See* 29 C.F.R. § 782.7(b)(2).

In fact, the evidence of record is quite the opposite. Defendants fill orders from fuel marketers on a daily basis as needed. The fuel marketers that Defendants work for are only some of the *customers* for whom the shippers' fuel is intended. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (noting that "there is a practical continuity of movement of the goods until they reach the customers for whom they are intended").

There is no evidence that the shippers have any knowledge, control, or concern as to where the goods will ultimately be delivered by Plaintiffs at the time the base gasoline is shipped from out of state. Thus, Defendants have failed to establish the requisite fixed and persisting transportation intent on the part of its shippers necessary to meet Defendants' burden of proving that the goods carried by Plaintiffs in this case are done so in interstate commerce for purpose of the Motor Carrier Act.

Defendants repeatedly argue that the shipper's fixed and persistent intent is established by make the following claim:

> The Suppliers/Shippers know the ultimate destinations of their shipments as the Suppliers' shipments to their fuel terminals in Port Everglades, is based upon standing orders from Suppliers' ratable volume of fuel which is based on various supply agreements, historical performance and sales with the end-user gas stations as determined by the petroleum Suppliers.

Defendants' Motion at pp. 15 and 16.

8

Numerous Courts have held that, where fuel marketers purchase fuel from a shipper's storage terminal for sale intrastate, the fuel's prior movement in interstate commerce ends at the storage terminal.

In *Mitchell v. Livingston & Thebaut Oil Co.*, 256 F.2d 757 (5th Cir. 1958), the court held that the shipper's fixed and persistent intent in transporting gasoline did not extend past the terminal storage tanks upon arriving in Florida when a fuel marketer purchases gasoline from the terminal for delivery to gas stations. The court reasoned:

> The gasoline that Richfield brought into Jacksonville and placed in its storage tanks was not allocated to Livingston & Thebaut in whole or in part. Although there was a contract by which Livingston & Thebaut agreed to buy and Richfield agreed to sell gasoline in overall annual quantities within the minimum and maximum of the contract, there were no pre-existing orders for any specific quantities. **It may be assumed that Richfield and Livingston & Thebaut could have made a fair estimate of the probable gasoline needs of Livingston & Thebaut for some advance interval. But this kind of anticipation will not keep the goods in interstate commerce.** *Walling v. Goldblatt Bros.*, 7 Cir., 1942, 128 F.2d 778, certiorari denied 318 U.S. 57, 63 S.Ct. 528, 87 L.Ed. 1130; *Jewel Tea Co. v. Williams*, 10 Cir., 1941, 118 F.2d 202. Pertinent here is the holding of the Supreme Court that, '**The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use.**' *Schechter Corporation v. United States*, 295 U.S. 495, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947.

*Id.* at 759 (emphasis added).

In *Daly v. Citrin*, 53 F. Supp. 876, 877–78 (E.D. Mich. 1943), the court similarly held that there was no fixed and persistent intent beyond the fuel storage terminal where (1) when the fuel arrives at the terminal, it is "not earmarked for any particular customer or to fill any particular contract or order," (2) the fuel may be "sold and delivered from such storage terminal to any customer, or any classification" in the local area, (3) the shipper's customers are four different fuel

9

marketers, and (4) orders are placed and delivered by fuel marketers on "day-to-day" basis. *Id.* at 877–78. The court held:

> Based on these facts, which are uncontroverted, the court is of the opinion and holds that **interstate movement of the petroleum products, imported into the River Rouge marine terminal, ceased at the point of their unloading from the boats into the tanks of the terminal for storage within the State of Michigan. At that point they definitely came to rest and became commingled with other personal property within the State of Michigan; and thenceforth upon being reloaded for shipment to Citrin-Kolb Oil Company, they moved exclusively in intrastate commerce.** Therefore, it cannot be said that the activities of any of the three truck drivers involved in this action were either in commerce or in the production of goods for commerce, within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 206.

*Id.* at 878 (emphasis added).

In *Lewis v. Shell Oil Co.*, 50 F. Supp. 547 (N.D. Ill. 1943), the court held that a fuel marketer's sale of gasoline to a retail gas station was not in interstate commerce where the storage terminal and gas station were both in the same state, even though the gasoline had previously come from out-of-state.

> The contract here in question was made in Illinois, the gasoline involved was located in Illinois, and was shipped only from defendant's bulk plant to plaintiff's filling station, both of which, it is agreed, were located in Illinois. I am of the opinion that **this was a purely intrastate transaction, the interstate movement having ended when the gasoline came to rest in defendant's bulk plant.**

*Id.* at 549 (emphasis added).

> 'We are unable to agree that, as set forth in paragraph 11 of the amended declaration, the plaintiff has alleged with substantial certainty that, owing to what it terms a continuous flow of gasoline, all gasoline brought into the northeastern territory *550 by the defendants remains in interstate commerce until it is delivered into the storage tanks of the retailer. While it is clear that the defendants must keep a supply on hand in their storage tanks to meet the fluctuations of demands of the retailers, **an anticipated demand by**

10

> **retail customers is not sufficient to render shipments a transaction in the course of interstate commerce until delivered to the customer whenever a demand arises.**4 In the case at bar defendant maintains a bulk or storage plant in Illinois, which is in effect a warehouse, and I do not believe that defendant's activities in maintaining and operating such a plant, from which it supplies the demands of filling station operators, can be construed as part of a continuous interstate haul. **The gasoline which is shipped by defendant to itself at its bulk plant in Chicago, there comes to rest, and is not designed for any specific customer, and therefore any subsequent local transaction concerning it constitutes no part of interstate commerce.** The Circuit Court of Appeals for this Circuit, in the case of *Walling v. Goldblatt Brothers*, 128 F.2d 778, 782, said:'Defendant knew in advance from its records in a general way, the needs of the retail stores and acted accordingly. But defendant was not relying on existing orders from its stores or customers. The goods arrives at the warehouses and came to rest. They were not destined for any specific customer or store. **The mere fact that an anticipated local transaction causes movement in interstate commerce is not sufficient to constitute the wholly local transaction after arrival a part of commerce.**'

*Id.* at 550 (emphasis added).

In *Atlantic Coast Line R. Co. v. Standard Oil Co.*, 275 U.S. 257 (1927), the Supreme Court similarly held that interstate commerce ends upon the petroleum product's delivery at the local storage terminal:

> *the interstate or foreign commerce in all this oil ends upon its delivery to the plaintiff into the storage tanks or the storage tanks at the seaboard*, and that from there its distribution to storage tanks, tank cars, bulk stations, and drivein [sic] stations, or directly by tank wagons to customers, is all intrastate commerce. This distribution is the whole business of the plaintiff in Florida. *There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff*. There is no designation of any particular oil for any particular place within Florida beyond the storage receptacles or storage tank cars into which the oil is first delivered by the ships. *The title to the oil in bulk passes to the plaintiff as it is thus delivered.* When the oil reaches these storage places along the Florida seaboard, it is within the control and ownership of the plaintiff for use for its particular purpose in Florida.

11

> ***The plaintiff is free to distribute the oil according to the demands of its business***, and it arranges its storage capacity to meet the future variation in its business needs […] The seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. ***There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company***…. everything that is done after the oil is deposited in the storage tanks…is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it. ***Neither the sellers, who deliver the oil, nor the railroad company, that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or any duty to discharge in respect to it***….

*Id.* at pp. 267–69

C.     Department of Labor Opinion Letter FLSA2005-10

Defendants filed DOL opinion letter FLSA2005-10 as Exhibit E to Defendant Carlos Assayag's Affidavit [DE 54-1]. Defendants do not discuss what level of deference the Court should accord DOL opinion letters.

Unlike regulations, which are enacted pursuant to the Administrative Procedure Act and undergo public notice and comment, agency opinion letters do not undergo formal adjudication or notice-and-comment rulemaking. DOL opinion letters, therefore, receive only *Skidmore* and not *Chevron* deference—they are entitled to "respect," but only to the extent that their interpretations have the power to persuade:

> Agency opinion letters "do not warrant *Chevron*-style deference." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). They are, however, "entitled to respect under ... *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the power to persuade." *Id.* at 1663 (quotation marks omitted). It is well established that the employer "bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence." *Klinedinst v. Swift Invs., Inc.,* 260 F.3d 1251, 1254 (11th Cir.2001) (quotation marks omitted). We have held that a FLSA exemption must be narrowly

construed so that it applies to those plainly within its terms and spirit. *Nicholson v. World Bus. Network, Inc.,* 105 F.3d 1361, 1364 (11th Cir.1997).

*Gregory v. First Title Of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009).

The analysis in opinion letter FLSA2005-10 is inapplicable to this case because (1) it applies factors not followed by controlling Eleventh Circuit authority, (2) involves different facts than the facts in this case, and (3) is not persuasive because it admits that it only has enough information to analyze three of its seven chosen factors, yet still renders its opinion without regard for those four additional factors.

Opinion letter FLSA2005-10 uses seven factors for determining the "fixed and persisting intent" of a shipper that merchandise continue in interstate.[22] Controlling Eleventh Circuit authority does not cite opinion letter FLSA2005-10 nor apply its seven factors when evaluating MCE cases. Instead, the Eleventh Circuit is in favor of a "general consideration that draws a fixed and persisting intent 'from all of the facts and circumstances surrounding the transportation.' " *Mena*, 2009 WL 3004009 at *4; *see also Walters,* 575 F.3d at 1221 (the court is "guided by practical considerations" when determining whether an employee's activities are part of interstate commerce for the purposes of the FLSA). Accordingly, the Court should not apply the factors used in opinion letter FLSA2005-10.

Opinion letter FLSA2005-10 classifies the drivers into two categories:

---

[22] (1) Even if a shipper does not know the ultimate destination of specific shipments, it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. This may include, but is not limited to, historical sales in the State, actual present orders, and relevant market surveys of need. (2) No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed. (3) While in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation. (4) Modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center. (5) The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier. (6) The warehouse utilized is owned by the shipper. (7) The shipments move through the warehouse pursuant to a storage in transit provision. Opinion Letter FLSA2005-10 at p. 2.

> Category A movements involve deliveries to customers for the shipper (typically a major petroleum refiner that retains control over the product until it reaches the destination intended by the shipper, such as a specific retail gas station or commercial end user) of predetermined quantities on a routine basis either to fill standing or specific orders or based on their historic demands for the products. Category B movements follow the sale of the product to marketers, and are based on preexisting contracts with the volume based on specific or standing orders from the marketers or on their historical usage, and the marketers arrange with *Name\** for the final transportation of the product. […] Additionally, no further processing of the petroleum occurs at the storage facility. The whole process is overseen by the shipper, meeting the requirements of the third factor.

Opinion Letter FLSA2005-10 at p. 3.

Plaintiffs in this case do not fit within either category. Plaintiffs do not fit within Category A because the shippers do not retain control over the fuel when it is loaded into Defendants' tanker trucks and delivered to retail gas stations. Refining companies at Port Everglades do not sell to retail gas stations.[23] Refining companies at Port Everglades sell to fuel marketers.[24] Fuel marketers sell to gas stations.[25] When the refining companies deliver base gasoline to storage terminals at Port Everglades, it is not yet known or determined which fuel marketer will purchase the gasoline, what kind of branded or branded gasoline product it will become, or which retail gas stations it will be delivered to.[26] Refining companies do not deliver base gasoline to Port Everglades terminals to fulfill specific orders of branded or unbranded gasoline by fuel marketers.[27] The refining companies have no connection with the retail gas stations and do not have contracts with them; instead, the gas stations have contracts with fuel marketers.[28] The shippers' control in the

---

[23] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 52.
[24] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 53.
[25] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 55.
[26] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 56.
[27] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 59.
[28] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶¶ 51-55.

fuel, therefore, does not continue until it reaches the retail gas stations as described in Category A of opinion letter FLSA2005-10.

Plaintiffs do not fit within Category B either. The opinion letter concludes that factors 1, 2, and 3 were met for Category B. Factor 2 does not apply to this case. [29]

In the present case, substantial processing occurs, and a sellable product is produced, after the base gasoline is delivered to Port Everglades but before Plaintiffs load the branded and unbranded gasoline into their trucks. Base gasoline, fuel detergents, ethanol, and other additives are mixed to create various branded and unbranded gasoline products. This transformation from base gasoline to branded and unbranded gasoline converts the base gasoline from a material that cannot be legally sold into one of an array of non-interchangeable branded and unbranded products specifically ordered by fuel marketers for sale to retail gas stations.

All gasoline delivered to Port Everglades is "base gasoline."[30] Base gasoline does not contain any fuel detergents, ethanol, or other fuel additives.[31] Pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, base gasoline cannot be sold to the general public and must be labeled, "Not for sale to the ultimate consumer."[32]

Gasolines sold at Port Everglades include "branded gasoline" such as Marathon, Citgo, Shell, Valero, Chevron, ExxonMobil, and Sunoco, and "unbranded gasoline," which is not marketed under a specific trade name.[33] Both branded and unbranded gasolines have fuel

---

[29] "2. No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed."
[30] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 23
[31] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 24
[32] "If the product being transferred is base gasoline, then in addition to the base gasoline identification, the following warning must be stated on the PTD: 'Not for sale to the ultimate consumer'. If, pursuant to § 80.160(a), the product being transferred is exempt base gasoline to be used for research, development, or test purposes only, the following warning must also be stated on the PTD: 'For use in research, development, and test programs only.'" 40 C.F.R. § 80.158(a)(5); Clean Air Act, 42 U.S.C. § 7401 *et seq.*; Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 25.
[33] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 26

detergents, ethanol, and other additives added to them.[34] Different brands of gasoline are defined by what fuel detergents, ethanol, and other additives are added to the base gasoline.[35]

All gasoline (100%) loaded into CWC trucks at Port Everglades have fuel detergents added to them.[36] More than ninety-nine and a half percent (>99.5%) of gasoline loaded into CWC trucks also has ethanol added to it.[37] The ethanol added to gasoline typically comprises 10% of the total volume of the gasoline.[38] Less than half of one percent (<0.5%) of gasolines loaded into CWC trucks at Port Everglades do not have ethanol added to them.[39] Gasolines with no ethanol added to them include diesel and "Rec-90".[40] Gasolines with no ethanol added to them, including diesel and Rec-90, still have fuel detergents and other additives added to them.[41]

Fuel detergents fundamentally alter the gasoline by preventing the accumulation of carbon deposits in vehicles' engines and fuel systems.[42] Fuel detergents greatly improve the vehicle's fuel economy, handling, drivability, longevity, and the time between vehicle repairs and maintenance.[43] Fuel detergents also reduce the vehicle's emissions into the atmosphere that cause pollution.[44] Different branded gasolines perform differently depending on their fuel detergents and other additives.[45]

All branded and unbranded fuel loaded into CWC trucks at Port Everglades are produced at Port Everglades mixing base gasoline, ethanol, fuel detergents, and other additives.[46] The fuel

---

[34] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 27
[35] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 28
[36] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 29
[37] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 30
[38] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 31
[39] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 32
[40] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 33
[41] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 34
[42] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 35
[43] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 36
[44] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 37
[45] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 38
[46] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 39

loaded into CWC trucks is fully mixed and processed branded and unbranded fuel.[47] No additional mixing or processing occurs during or after the time CWC truck drivers transport the fuel.[48]

CWC gives its tanker truck drivers computer tablets with the gasoline orders to be fulfilled each day.[49] The tablets specify separately which terminal at Port Everglades to go to, and whether branded or unbranded gasoline is ordered.[50] When the driver arrives at the terminal, the driver enters into a computer kiosk at the terminal the number of gallons ordered and the type of gasoline ordered; e.g., regular 87-octane branded, regular 87-octane unbranded, mid-grade 89-octane branded, mid-grade 89-octane unbranded, premium 93-octane branded, premium 93-octane unbranded, and diesel.[51] The computer system then mixes and loads into the truck the precise quantities of base gasoline, fuel detergent, ethanol, and other additives that create the brand of gasoline ordered.[52]

Once branded and unbranded gasolines are produced, those gasolines are not interchangeable.[53] By law and in practice, CWC cannot sell one branded or unbranded gasoline as a different branded or unbranded gasoline.[54] Similarly, after they have been produced, branded and unbranded gasolines cannot then be mixed and sold as something else.[55]

Pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, with few exceptions,[56] all gasoline sold to the ultimate consumer and to retail gas stations in the United States must contain detergents to prevent the accumulation of deposits in engines and fuel supply systems.[57]

---

[47] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 40
[48] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 41
[49] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 42
[50] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 43
[51] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 44
[52] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 45
[53] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 46
[54] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 47
[55] Plaintiffs' Response to Defendants' Statement of Material Facts at ¶ 48
[56] Only (1) gasoline used in research, development, and testing, (2) racing and aviation fuel, and (3) gasoline that is sold or process in California are exempt from containing detergents. 40 C.F.R. § 80.160.
[57] Detergents. Effective beginning January 1, 1995, no person may sell or dispense to an ultimate consumer in the United States, and no refiner or marketer may directly or indirectly sell or dispense

Unless gasoline contains detergents that meet specific additive certification requirements, the gasoline cannot be sold to consumers or retail gas stations.[58] The unique formulas of fuel detergents are usually protected by patents.[59]

### I. Conclusion

For the foregoing reasons, Plaintiffs are not exempt from the FLSA under the MCE as a matter of law. Defendants' Motion for Summary Judgment [DE 54] should be DENIED and Plaintiffs' Motion for Partial Summary Judgment [DE 56] should be GRANTED.

Respectfully submitted,

Koz Law, P.A.
320 S.E. 9th Street
Fort Lauderdale, Florida 33316
Phone: (786) 924-9929
Fax:     (786) 358-6071
Email: ekoz@kozlawfirm.com

_____
Elliot Kozolchyk, Esq.
Bar No.: 74791

---

to persons who sell or dispense to ultimate consumers in the United States any gasoline which does not contain additives to prevent the accumulation of deposits in engines or fuel supply systems.
[58] 40 CFR 80.161(b) - Detergent additive certification requirements; 42 U.S.C.A. § 7545(l).
[59] *See, e.g., Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1365 (S.D. Fla. 2016).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on November 6, 2017 with the Clerk of Court using CM/ECF along with having served all counsel of record or pro se parties identified on the service list incorporated herein in the manner specified, either via transmission of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties not authorized to receive electronically Notice of Electronic Filing.

Respectfully submitted,

_____
Elliot Kozolchyk, Esq.

## SERVICE LIST

Randy M. Goldberg, Esq.
*Counsel for Defendants*
Randy M. Goldberg & Associates, P.A.
1101 SW 71st Ave
Plantation, FL 33317
Tel: (754) 224-0867
E-mail: rmgesq@comcast.net, randymgoldberg@gmail.com