**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:** 17-60098-civ-Zloch

CLAUDIO ALFONSO PALLARES, et al.,

    Plaintiffs,

v.

CWC TRANSPORTATION, LLC, et al.,

    Defendants.

_____/

**PLAINTIFFS' REPLY IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, by and through the undersigned counsel, file this reply in support of Plaintiffs' Motion for Partial Summary Judgment [DE 56] ("Motion"), and in opposition to Defendants' Response to Plaintiff's [sic] Motion for Partial Summary Judgment [DE 61] ("Response"). Plaintiffs brought their claims under the Fair Labor Standards Act ("FLSA"), and seek summary judgment as to the inapplicability of the Motor Carrier Exemption ("MCE"). In support of this reply, Plaintiffs state the following:

**I.      Defendants' Failure to Comply with Local Rule 56.1(a)[1]**

Defendants filed "Defendants' Second Statement of Undisputed Material Facts in Support of Its Respone [sic] to Plaintiff's [sic] Motion for Summary Judgment" [DE 61-1] ("Second Statement"). Defendants' Second Statement does not correspond with the order and paragraph

---

[1] Today, November 13, 2017, Defendants filed a responsive statement of material facts as an attachment to Defendants' Reply to Plaintiff's [sic] Response to Defendants' Motion for Summary Judgment [DE 69]. The responsive statement is untimely and improper because it was attached to Defendants' reply to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [DE 63] instead of being filed with Defendants' response to Plaintiffs' Motion for Partial Summary Judgment [DE 56]. The responsive statement fails to comply with Local Rule 56.1(a) by failing to cite any evidence in support of Defendants' denials and assertions. Plaintiffs object to "Defendants' Response to the Plaintiff's [sic] Statement of Material Facts & in Support of Its Motion for Summary Judgment" [DE 69-1] being considered as part of the record.

numbering of Plaintiffs' Statement of Material of Facts [DE 55] as required by Local Rule 56.1(a), nor controvert each material fact.

Local Rule 56.1(b) provides that all uncontroverted facts are deemed admitted:

> **(b) Effect of Failure to Controvert Statement of Undisputed Facts.** All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record.

The Court's Order of Instructions [DE 18] ("Order") emphasizes that "the Court expects that the Parties shall abide by the Federal and Local Rules" and "stress[ed] certain Rules that are all too often ignored by parties." *Id.* at p. 1. The Order reaffirmed that "[a]ny motion for summary judgment *must* comport with Local Rule 56.1(a)." *Id.* at p. 2 (emphasis added). The Order warned that "*[t]he Court strictly enforces the provision of Local Rule 56.1(a) and its requirements concerning the statements of fact that are to accompany any motion for summary judgment and the response thereto.*" *Id* (emphasis added).

## II. Plaintiffs' Pleadings

Defendants repeat their argument from their Motion for Summary Judgment [DE 54] at pp. 10-11. For the reasons stated in Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [DE 63] at pp. 3-4, Plaintiffs' pleadings do not allege that the plaintiffs were engaged in interstate commerce under the MCE. Additionally, the standard for interstate commerce under FLSA's Enterprise Coverage is different from the MCE.[2]

## III. The Processing of Base Gasoline into Branded and Unbranded Gasolines at Port Everglades Terminates Prior Interstate Continuity of Movement

The base gasoline delivered to Port Everglades is a fungible commodity. Mixing the base gasoline, ethanol, detergents, and other fuel additives at Port Everglades creates various branded and unbranded gasolines that are not fungible commodities.

> [T]he Court agrees with the Magistrate Judge that Shell, by including a special additive in its fuel, does not sell a fungible commodity. *See, e.g., Power Test,* 754 F.2d at 98 ("Power Test gasoline is simply not fungible with any and all other

---

[2] *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970).

> gasolines"); *Freeman v. United Cities Propane Gas of Georgia, Inc.,* 807 F.Supp. 1533, 1540 (M.D.Ga.1992) (gasoline is not a fungible good because "various companies place additives in the product in an attempt to distinguish their brand from other very similar brands").

*Shell Oil Co. v. A.Z. Services, Inc.*, 990 F. Supp. 1406, 1413 (S.D. Fla. 1997).

In *Mobil Oil Corporation v. Commissioner of Revenue*, 25 Mass. App. Tax Bd. Rep. 722, 728 (2000) ("*Mobil Oil*"),[3] the Appellate Tax Board for the Commonwealth of Massachusetts was tasked with determining whether the processing of base gasoline into various branded and unbranded gasolines constituted "the actual manufacture of tangible personal property to be sold."[4] Although *Mobil Oil* is not controlling authority, it is cited as persuasive authority because the facts and analysis of processing base fuel into branded and unbranded gasolines are nearly identical to the present case.

In *Mobil Oil*, the base fuel was processed similarly as in Port Everglades:

> **Treatment of gasoline.**
> The two grades of gasoline, 93 octane and 87 octane, are pumped from the receipt tanks to the "loading rack," a roofed ten-bay structure at the East Boston plant from which tanker trucks load fuel. As the unleaded base fuel is pumped from the receipt tanks to the loading rack, certain chemical additives, stored in separate tanks adjacent to the loading rack, are pumped to the rack and mixed with the unleaded gasoline just before the gasoline enters the tanker truck. Both the gasoline and the additives must be pumped to the rack at certain velocities and flow rates to ensure proper mixing of the two before the mixture enters the truck.
>
> The base gasoline is subjected to two categories of additives at the East Boston plant. **The first category of additives consists of detergents required by federal law.[1] The dissolution of these detergent additives in the gasoline alters the chemical makeup of the gasoline by creating a new solution. The second category of additives consists of engine protectors including corrosion**

---

[3] An official copy of the decision is attached as Exhibit A. An unsigned unofficial copy is downloadable here: http://www.mass.gov/anf/hearings-and-appeals/decisions/tax-appeal-decisions/findings-promulgated-during-2000/jan-2000-to-june-2000/

[4] Within the meaning of the Commonwealth of Massachusetts General Law chapter 64H §§ 6(i) and (r).

3

> **inhibitors, de-icers and demulsifiers. These additives protect engine parts, improve an automobile's fuel economy, improve driveability and decrease maintenance costs. Automobile manufacturers recommend that owners use such "additized" gasoline in their vehicles.**
>
> Mobil also creates fuel, called mid-grade gasoline, by blending 87 octane gasoline with 93 octane gasoline at the loading rack. Most of the gasoline passing through the East Boston plant, including some gasoline which is ultimately sold under the brand name of competitors, is owned by Mobil up until the point it leaves the plant in the tanker trucks.
>
> n. 1. The applicable federal requirement, pursuant to the Clean Air Act, went into effect on January 1, 1995. As testified to at the hearing, and not refuted by the Appellee, Mobil had voluntarily added these detergent additives to its base fuel gasoline since 1989. Since January 1, 1992, Mobil has not sold any "unadditized" gasoline from the East Boston facility. Mobil, as a gasoline producer, is subject to a $25,000 per day fine for selling "unadditized" gasoline.

Exhibit A at pp. 3-4 (emphasis added).

The Board then explained how processing the base gasoline into additized gasoline—i.e., branded and unbranded gasolines—fundamentally changed its character, utility, and value:

> Base gasoline, both 87 and 93 octane, is processed into a number of products: "additized" Mobil 87 and 93 octane unleaded gasoline, a mid-grade additized Mobil 89 octane unleaded gasoline, and a variety of other generic and other-branded additized gasoline. **The additized gasoline has a different nature than the base fuel. Dissolved in the additized gasoline are chemical detergent additives which permit more complete combustion of the fuel, thereby reducing emissions, as well as chemical engine performance enhancers, including de-icers, demulsifiers and corrosion inhibitors. These additives protect engine parts, improve driveability and fuel economy, and decrease maintenance costs.**
>
> **The fact that "unadditized" gasoline could be used to power an engine does not change the result. It would have been *illegal* to sell the base fuel to consumers for use in automobiles without addition of certain of the additives introduced by Mobil at the**

4

> **East Boston plant.  Accordingly, the additized fuel is substantially different than the base fuel received because, like the diesel fuel, it has been converted into a marketable product with new properties.** Compare *Assessors of Boston v. Commissioner of Corporations and Taxation*, 323 Mass. 730 (1949)(blending and roasting of green coffee beans to make ground coffee suitable for brewing and adding chocolate to milk to make chocolate milk constituted manufacturing because of change to raw material) with *Noreast Fresh, Inc. v. Commissioner*, 1998 Mass. A.T.B. Adv. Sh. 795 (Docket No. F226284)(cutting vegetables into smaller, more useable size not manufacturing because no significant change to raw material) and *Alcan Aluminum v. Commissioner*, 21 Mass.App.Tax Bd. Rep. 80 (1997)(cutting large pieces of metal into smaller, more useable pieces, not manufacturing because no significant change to raw material).
>
> **The additized fuel even has a different name, receiving the Mobil brand name, or other brand names, only after inclusion of proprietary additives.  The dissolved additives are what differentiates the gasoline leaving the East Boston plant with Mobil's name from gasoline leaving East Boston with the name of Mobil's competitors.**

Exhibit A at pp. 17-18 (emphasis added).

In *Mobil Oil*, the Board analyzed the processing of the gasoline to determine whether it constituted "manufacturing" pursuant to the language of a state statute in order to qualify for a tax exemption. The terms "manufacture" and "manufacturing" are not susceptible to an exact or precise definition.  "'[M]anufacturing' is chameleon-like in the different definitions given to it." *William F. Sullivan v. Commissioner of Revenue,* 413 Mass. 576, 578-579 (1992)(quoting *Southeastern Sand & Gravel, Inc. v. Commissioner of Revenue,* 384 Mass. 794, 795 (1981)).

Given the varying "chameleon-like" definitions of "manufacturing," whether something constitutes "manufacturing" is largely semantics. Eleventh Circuit authority does not require "manufacturing" to terminate interstate continuity of movement under the MCE. Courts look to whether there was a "transformation" to the product that "materially changes the character, utility and value." *Pritchett v. Werner Enterprises, Inc.*, CIV.A. 12-0182-WS-C, 2013 WL 6909892, at *5 (S.D. Ala. Dec. 31, 2013). Courts look to whether a product underwent processing that resulted in "the creation of an article of commerce." *Roberts v. Levine*, 921 F.2d 804, 807, 816 (8th

5

Cir.1990). Courts look to whether material "has been subjected to a manufacturing process that materially changed its character, utility, and value." *Arkadelphia Milling Co. v. St. Louis Southwestern Railway Co.*, 249 U.S. 134, 150–51 (1919).

Defendants argue that *Pritchett*, *Roberts,* and *Arkadelphia Milling* are all distinguishable because the processing of the products occurred before their interstate journey began whereas in the present case, processing of the various branded and unbranded gasolines occurs after the base gasoline arrives in Florida. Eleventh Circuit cases that analyze whether solely intrastate movement constitutes continuity with prior interstate movement always look to whether product modification occurred during transit to terminate interstate continuity of movement.

Defendants urge the Court to apply *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 942 (5th Cir. 1969) and *Narbona v. Gold Coast Beverage Distributors, Inc.*, 1:13-CV-24148-UU, 2014 WL 11906594 (S.D. Fla. July 15, 2014).[5] In support, Defendants make this astonishing claim:

> [S]imilar to the case at bar, there was clearly no processing or other material changes that occurred to the petroleum products once the petroleum products were turned over to the Plaintiffs/drivers on behalf of the Defendants. (2d SOF ¶¶8, 10.) As such, the Plaintiffs' intrastate movement of the petroleum products was definitely the final leg in interstate commerce and thus, the Motor Carrier Exemption applies to the case at bar.

Defendants' Response at p. 4.

As explained in detail in Plaintiffs' affidavits,[6] and Plaintiffs' Statement of Material Facts [DE 55 at ¶¶ 8-34, 46], the branded and unbranded gasolines loaded into Defendants' tanker trucks are produced at Port Everglades on a daily, as-needed basis at the moment Plaintiffs select the fuel to load into Defendants' tanker trucks. Specifically:

> CWC gives its tanker truck drivers computer tablets with the gasoline orders to be fulfilled each day. The tablets specify separately which terminal at Port Everglades to go to, and whether branded or unbranded gasoline is ordered. When the driver arrives at the terminal, the driver enters into a computer kiosk at the terminal the number of gallons ordered and the type of gasoline ordered; e.g., regular 87-octane branded, regular 87-octane unbranded, mid-grade

---

[5] Defendants' Response at p. 4.
[6] *Avila Aff.* at ¶¶ 8-14, 21; *Cardullo Aff.* at ¶¶ 8-14; *Pallares Aff.* at ¶¶ 8-14; *Demps Aff.* at ¶¶ 8-14.

> 89-octane branded, mid-grade 89-octane unbranded, premium 93-octane branded, premium 93-octane unbranded, and diesel. The computer system then mixes and loads into the truck the precise quantities of base gasoline, fuel detergent, ethanol, and other additives that create the brand of gasoline ordered.

Plaintiffs' Statement of Material Facts at ¶¶ 28-31.

Unlike in the present case, in *Galbreath* the court explained that the gasoline was unaltered, there was no processing or comingling, and no additives were introduced during transit:

> **The transported products are the identical products tendered to and shipped via Colonial Pipeline Company lines from Gulf's refineries; there is no commingling of product in transit. Gulf withdraws at the Chattahooche Terminal the same Gulf products tendered at the refinery for shipment through Colonial's pipelines.** The products diverted through the Powder Springs, Georgia stub line from the main 36-inch line consist of an amount of transported product determined prior to tender to Colonial. This product is 'bled off' at Powder Srpings [sic] from a much larger 'slug' of Gulf products tendered at one of its refineries and moving along the main pipeline destined for Gulf delivery points at Atlanta and other locations on the main line. The amount to be moved to the Chattahoochee Terminal, as well as to all other points along the Colonial line (which terminates in Linden, N.J.) is determined by Gulf prior to the initial tender of product for movement at the refinery. With the exception of a de-icer added to Gulf A-1 Jet Fuel delivered to one customer served by Gulf's Atlanta Bulk Plant, **no processing or alteration of the transported products occurs at the Chattahoochee Terminal or at any location after the product leaves the refinery, nor does the introduction of additives occur at any time after the products leave the refinery.**[3]
>
> n. 3. Plaintiffs have not made an issue over this small amount of processing and neither do we. The adding of the de-icer to an insignificant amount of the total gallonage at the Atlanta Bulk Plant has no effect on the continuity of movement in interstate commerce.

*Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 943 (5th Cir. 1969) (emphasis added).

Unlike in the present case, in *Galbreath*, the transported product is "determined prior to tender to Colonial." *Id.* "The amount to be moved to the Chattahooche Terminal, as well as to all

7

other points along the Colonial line (which termins in Linden, N.J.) is determined by Gulf prior to the initial tender of product for movement at the refinery." *Id.*

In the present case, when base gasoline is delivered to storage terminals at Port Everglades, it is not yet known or determined which fuel marketer will purchase that gasoline, what kind of branded or unbranded gasoline it will become, or which retail gas stations it will be delivered to.[7] Refining companies do not deliver base gasoline to Port Everglades terminals to fulfill specific orders of branded or unbranded gasoline by jobbers.[8] Therefore, the shippers cannot have a fixed and persistent intent for the base gasoline beyond the storage terminals at Port Everglades, at the time the shipment is shipped, when the finished branded or unbranded gasoline has not yet been produced or ordered, and neither the fuel marketer, carrier, nor gasoline station have been determined.

Defendants also urge the Court to apply *Narbona*. But in *Narbona*, the products transported were not altered or modified:

> Second, as in *Mena*, Gold Coast did not at any point alter or modify the kegs. Goicoechea Affidavit at ¶ 10; *see* 1992 Policy Statement, 1992 WL 122949, at *2 (the absence of alterations and modifications evidences that the shipper intended the product to continue to its customers through the storage terminal as part of one continuous stream of interstate commerce); *Collins*, 2008 WL 5423550, at *16 (same).

*Narbona* at *5.

Defendants attempt to distinguish *Romero v. Fueltech Oil Serv. Corp.*, 09-21948-CIV, 2010 WL 11505519, by first arguing that "Targa's trucks transported the fuel to Defendants' own local facility, where it is placed into the Defendants' own temporary storage tanks."[9] Defendants are referring to the defendant Florigas, Inc. Defendants fail to mention that the other defendant, Fueltech Oil Service Corp., like Defendants in the present case, loaded fuel directly from TransMontaigne's fuel terminals at Port Everglades: "At Port Everglades, the fuel is pumped into

---

[7] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 42].
[8] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 45].
[9] Defendants' Response at p. 6.

8

Transmontaigne's large storage tanks. […] Fueltech purchases the fuel from TansMontaigne's storage tanks on a daily basis, to satisfy existing orders to its customers." *Id.* at *1.

Second, Defendants argue that they are a common carrier "whose sole purpose is the transportation of petroleum products from the Suppliers' fuel terminals at Port Everglades to the Suppliers' end-user retail customers…"[10] Contrary to Defendants' claim, the refining companies' customers are fuel marketers and not retail gas stations.[11]

Third, whether Defendants are a common carrier does not alter the analysis. Defendants are hired and paid by the fuel marketers—not the refining companies—to transport fuel from Port Everglades terminal to retail gas stations.[12] Defendants fill orders for fuel marketers on a daily, as-needed basis.[13]

Defendants' Response proceeds to analyze the factors set forth in DOL opinion letter FLSA 2005-10. For the reasons set forth in Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [DE 63 at pp. 12-18], the opinion letter is not entitled to *Chevron* deference, applies factors not followed by controlling Eleventh Circuit Authority, involves different facts than the facts in this case, and is not persuasive because it admits that it only has enough information to analyze three of its seven chosen factors for "Category B" drivers, yet still renders an opinion without regard for those four additional factors.

Defendants argue that "[c]ertain petroleum products like diesel fuel or Rec-90 are not subject to any additives."[14] This claim is controverted by Plaintiffs' Statement of Material Facts: All gasoline (100%) loaded into CWC trucks at Port Everglades have fuel detergents added to

---

[10] Defendants' Response at p. 7.
[11] "Refining companies at Port Everglades do not sell directly to retail gas stations. Refining companies sell to "jobbers" such as Sunshine Gasoline Distributors, Inc. A jobber is a petroleum marketer that acts as a "middleman" between the refining companies and the retail gasoline stations. Jobbers sell gasoline to retail gas stations which, in turn, sell gasoline to the ultimate consumer." Plaintiffs' Statement of Material Facts [DE 55 at ¶¶ 38-41].
[12] Plaintiffs' Statement of Material Facts [DE 55 at ¶¶ 43-44].
[13] Plaintiffs' Statement of Material Facts [DE 55 at ¶¶ 46].
[14] Defendants' Response at p. 3.

them.[15] Gasolines with no ethanol added to them include diesel and "Rec-90".[16] Gasolines with no ethanol added to them still have fuel detergents and other additives added to them."[17]

Furthermore, Defendants do not deny nor controvert that more than ninety-nine and a half percent (>99.5%) of gasoline loaded into CWC trucks has ethanol added to it.[18] The ethanol added to gasoline typically comprises ten percent (10%) of the total volume of the gasoline.[19] Less than half of one percent (<0.5%) of gasolines loaded into CWC trucks at Port Everglades do not have ethanol, but still have fuel detergents and other additives added to them.[20]

Even if the less than half of one percent (<0.5%) of gasolines loaded into CWC trucks that do not have ethanol added to them at Port Everglades also did not have fuel detergents and other additives added to them,[21] such a small amount would be *de minimus*. *See Walters v. Am. Coach Lines Of Miami, Inc.*, 575 F.3d 1221, 1227–28 (11th Cir. 2009) (examining authority on the *de minimus* exception to the MCE's interstate commerce requirement and concluding that "[o]n the whole, these cases suggest that a company's interstate business is *de minimus* if it constitutes less than one percent of the overall trips taken by the company").

Pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the base gasoline delivered to Port Everglades could not be legally sold without further processing. Failure to comply with the Clean Air Act would have subjected the refining companies to penalties of $95,284 per day of violation.[22]

## IV.   Conclusion

For the foregoing reasons, Plaintiffs are not exempt from the FLSA under the MCE as a matter of law. Defendants' Motion for Summary Judgment [DE 54] should be DENIED and Plaintiffs' Motion for Partial Summary Judgment [DE 56] should be GRANTED.

---

[15] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 15].
[16] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 19].
[17] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 20].
[18] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 16].
[19] Plaintiffs' Statement of Material Facts [DE 55 at ¶ 17].
[20] Plaintiffs' Statement of Material Facts [DE 55 at ¶¶ 18 and 20].
[21] Plaintiffs do not concede this point and, in fact, have submitted affidavits directly controverting it. Plaintiffs' Statement of Material Facts [DE 55 at ¶ 15, 19, 20].
[22] Pursuant to 42 U.S.C. § 7524, the original daily penalty was $25,000. Federal Civil Penalties Inflation Adjustment Improvement Act of 2015 increased the penalty to $95,284. *See* Table 2 of 40 C.F.R. § 19.4 of the EPA Civil Monetary Penalty Inflation Adjustments Rule.

Respectfully submitted,

Koz Law, P.A.
320 S.E. 9th Street
Fort Lauderdale, Florida 33316
Phone: (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

_____
Elliot Kozolchyk, Esq.
Bar No.: 74791

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on November 13, 2017 with the Clerk of Court using CM/ECF along with having served all counsel of record or pro se parties identified on the service list incorporated herein in the manner specified, either via transmission of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties not authorized to receive electronically Notice of Electronic Filing.

Respectfully submitted,

_____
Elliot Kozolchyk, Esq.

## SERVICE LIST

Randy M. Goldberg, Esq.
*Counsel for Defendants*
Randy M. Goldberg & Associates, P.A.
1101 SW 71st Ave
Plantation, FL 33317
Tel: (754) 224-0867
E-mail: rmgesq@comcast.net, randymgoldberg@gmail.com